**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ALISHA CLAIBORNE ex rel., L.D., a minor,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10 C 7728** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alisha Claiborne is seeking to recover Supplemental Security Income ("SSI") on behalf of her minor daughter, L.D., under Title IX of the Social Security Act. 42 U.S.C. § 1382c(a)(3)(C). The Commissioner of Social Security ("Commissioner" or "Defendant") denied the application for benefits at all levels of administrative review, prompting this appeal. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment. After careful review of the record, the Court grants Plaintiff's motion, denies Defendant's motion, and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on November 21, 2004, alleging that her then-20-month-old daughter L.D. had been disabled since birth due to asthma. (R. 47-48). The Social Security Administration ("SSA") denied the application initially on April 26, 2005, and again on reconsideration on July 11, 2005. (R. 55-59, 63-66). Following a November 9, 2006 hearing, Administrative Law Judge Cynthia M. Bretthauer (the "ALJ") found on December

26, 2006 that L.D. was not entitled to any benefits. (R. 13-26). Plaintiff sought judicial review of the ALJ's decision, and the parties agreed on December 15, 2008 to remand the case for further proceedings. *Claiborne v. Astrue*, No. 08 C 2775, Doc. 34. In conformance with the district court's remand Order, the Appeals Council vacated the earlier ruling and instructed the ALJ to: update the medical and school records; further evaluate L.D.'s speech/language disorder; expressly consider L.D.'s sleep apnea and obesity; and, if necessary, obtain testimony from a medical expert ("ME") to clarify the nature and severity of L.D.'s impairments. (R. 295-96).

The ALJ held a second hearing on September 21, 2010. Plaintiff and L.D. both testified in the presence of counsel, and Dr. Sai R. Nimmagadda appeared as an ME. (R. 487-543). Less than a month later, on October 5, 2010, the ALJ concluded that L.D. is not disabled within the meaning of the Act because she does not have an impairment or combination of impairments that functionally equals the relevant listings. (R. 272-88). Plaintiff once again seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for a remand, Plaintiff argues that the ALJ erred in analyzing two domains of L.D.'s functioning: interacting and relating with others, and caring for yourself. With respect to the first domain, Plaintiff argues that the ALJ (1) failed to properly evaluate SSR 98-1p in finding that L.D. does not have a marked or extreme limitation in speech and language functioning; (2) failed to clarify whether the ME adequately considered SSR 98-1p in formulating his opinion; (3) erred in finding that L.D.'s oppositional defiant disorder is only a marked and not extreme limitation; and (4) failed to compare L.D. to children without impairments as required by SSR 09-1p. Plaintiff claims

2

that the ALJ further erred in her analysis of the caring for yourself domain by (5) once again failing to compare L.D. to children without impairments; and (6) failing to consider all of L.D.'s impairments in combination. In addition to these arguments, Plaintiff also objects that the ALJ (7) violated the law of the case doctrine by finding that L.D. had a less than marked limitation in the domain of health and physical well-being; and (8) failed to make a credibility determination regarding Plaintiff's testimony.

As discussed below, the Court agrees that the ALJ failed to properly analyze whether L.D. had a marked limitation in speech prior to September 1, 2009, requiring a remand. The ALJ should also clarify whether the ME was familiar with and considered all relevant Rulings and regulations, and whether L.D.'s self-injurious behavior as noted in March 2010 had any impact on her ability to care for herself after March 2010.

## FACTUAL BACKGROUND

L.D. was born on February 16, 2003. (R. 275). Her seven-month check-up on August 25, 2003 was normal and she was in the 90th percentile for weight. (R. 134, 135). At some point that year, however, L.D. started exhibiting asthma symptoms and began a regimen of Nasonex, Singulair, Pulmicort and an Albuterol nebulizer. (R. 102).

**A.    Medical History**

**1.    Age 1 to Age 3 (February 16, 2004 to February 16, 2006)**

**a.    Age 1**

On March 30, 2004, Plaintiff filled out a Child Medical Questionnaire on behalf of L.D. at the Children's Hospital of Wisconsin. (R. 225-28). Plaintiff indicated that L.D.'s family physician, Dr. Michael Mann, had referred her to the hospital due to asthma and

related breathing problems. (R. 225). Plaintiff reported that L.D.'s overall health was "very good," but that she had problems with congestion, snoring, mouth breathing, coughing and waking up at night with difficulty breathing. (R. 227-28). Dr. Margaret M. Lowery examined L.D. and found her nasal passages to be boggy and congested. L.D. exhibited some wheezing and rhonchi, and Dr. Lowery diagnosed her with mild persistent asthma and rhinitis. (R. 229-32). In a report of findings to Dr. Mann, Dr. Lowery indicated that L.D. suffered from mild persistent asthma with exacerbation, vasomotor rhinitis and possible allergic rhinitis. (R. 164-65). She recommended that L.D. take Prelone, Pulmicort, Albuterol and Zyrtec, and scheduled her for some x-rays. (R. 165).

L.D.'s April 6, 2004 lateral radiograph of the neck showed her adenoids to be "in the upper limits of normal in size." (R. 162). At a follow-up examination on June 8, 2004, Dr. Lowery confirmed L.D.'s diagnosis of mild persistent asthma and non-allergic rhinitis. She also noted that L.D. had adenoid hypertrophy, and recommended that she follow up with an ENT (ear, nose and throat) specialist. (R. 161).

Several months later on August 27, 2004, Plaintiff took L.D. to see Dr. Manfred Man of the Robert R. McCormick University Clinics. Dr. Man reported that L.D.'s physical examination was normal, though she was still on Zyrtec and Albuterol for her asthma. (R. 138, 141). On October 19, 2004, Plaintiff took L.D. to the emergency room at Lake Forest Hospital because she had a fever, nasal congestion and difficulty breathing. (R. 167). Dr. Irina Trosman diagnosed L.D. with influenza and kept her in the hospital overnight due to a concern about enlarged tonsils and airway obstruction. (R. 166, 168). L.D.'s asthma was "under good control" but Dr. Trosman observed that she suffered from apnea. (R. 170-71).

Dr. Trosman discharged L.D. on October 20, 2004 with instructions to follow up with an ENT and Dr. Man. (R. 177).

Less than a week later, on October 25, 2004, Dr. Stephen F. Conley evaluated L.D. at the request of Dr. Lowery. In addition to the asthma, Dr. Conley found that L.D. had "upper airway obstruction due to adenotonsillar hypertrophy," and recommended that she have a tonsillectomy and adenoidectomy. (R. 224). Plaintiff took L.D. back to Dr. Lowery the next day with continued complaints of nasal congestion. Dr. Lowery again diagnosed mild persistent asthma and rhinitis, along with acute sinusitis and adenoid hypertrophy. (R. 155-57). She adjusted L.D.'s medication and noted that she was scheduled for surgery in three weeks. (R. 155, 157).

In anticipation of filing an application for SSI, Plaintiff completed a "Function Report - Child Age 1 to 3rd Birthday" on behalf of L.D. on October 28, 2004. (R. 79-84). Plaintiff reported that L.D., who was 20 months old at the time, was unable to talk and was "hardly ever" understood even by people who knew her well. (R. 81). She was able to wave "bye-bye," follow one- and two-step directions, and listen to stories being read for at least 5 minutes, but she did not play "pat-a-cake," use one or more words, play "pretend," use her own name or refer to herself, or know the parts of the body and face. (R. 82). Plaintiff stated that with respect to physical activities, L.D. could "do most things as a 1 ½ year old," but she tired easily due to shortness of breath. (R. 83). L.D. was able to drink from a cup without help and feed herself with a spoon, and she tried to be friendly with other children. She would not cooperate in getting dressed and brushing her teeth, however, and she was unable to get undressed by herself. (R. 84).

5

On December 1, 2004, Dr. Conley performed surgery to remove L.D.'s adenoids and tonsils. (R. 148-53). Approximately one week later on December 9, 2004, Plaintiff completed another "Childhood Function Report - 1 to 3 Years" for L.D., who was then nearly 22 months old. (R. 86-89). L.D. was able to ask for objects by pointing, but did not understand simple phrases, imitate housework, refer to herself by name, know her age or sex, or put 2 to 3 words together to form a thought. She showed interest in playing with simple games and toys, and paid attention while looking at picture books or listening to stories. She also cooperated with caregivers in dressing and other self-care, gave kisses and hugs upon request, smiled in response to praise, played simple games, and played alongside other children. (R. 86). Yet she could not watch a 30-minute children's show, complete an activity such as coloring, puzzles or games, respond to the feelings of others, or communicate her needs beyond gestures. (R. 86-87). In the areas of moving about and caring for herself, L.D. was able to walk with one hand held, climb on furniture, play with blocks and toys and feed herself with her hands. She could also drink from a cup without assistance, and she showed interest in toilet training and exhibited independence by saying "no" or hoarding toys. (R. 87-88).

L.D. saw Dr. Conley on December 21, 2004 for a post-operative evaluation. She did not have any bleeding and her snoring was "resolved" at that time. (R. 147). The following month, on January 18, 2005, L.D. returned to Dr. Lowery with congestion, coughing and a mild exacerbation of her moderate persistent asthma. Dr. Lowery adjusted L.D.'s medications and instructed her mother to bring her back in three months. (R. 144-46).

### b.    Age 2

On March 3, 2005, Plaintiff took L.D. to see Dr. Man because she had a cough, cold and fever, but the doctor's notes are largely illegible. (R. 141-42). On April 12, 2005, Dr. Padma Talcherkar completed a Childhood Disability Evaluation Form for the SSA. She found L.D. to have a less than marked limitation in the domain of Health and Physical Well-Being, noting that L.D. had "shown only mild exacerbations" in her asthma, and did not require repeated hospitalizations, treatments or ER visits. Dr. Talcherkar determined that L.D. had no limitations in any domain. (R. 179-84).

Plaintiff completed another "Childhood Function Report - 1 to 3 Years" on behalf of L.D. on June 3, 2005. The report was nearly identical to the one Plaintiff filled out on December 9, 2004, except that at 27 months old, L.D. could now understand simple phrases, refer to herself by name, communicate wishes and needs usually by gestures, walk down stairs alternating feet, and try to do simple dressing. (R. 90-93). She continued to cooperate with caregivers, feed herself with her hands, drink from a cup unassisted, and show independence. (*Id.*).

A little more than a month later, on July 9, 2005, Dr. Raymond Castaldo reconsidered Dr. Talcherkar's assessment of L.D.'s limitations for the SSA. In his Childhood Disability Evaluation Form, Dr. Castaldo agreed that L.D. had no limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, Moving About and Manipulating Objects, and Caring for Yourself. (R. 199-202). He found, however, that L.D. had a marked (as opposed to less than marked) limitation in the domain of Health and Physical Well-Being based on her

7

history of asthma and certain other medical problems. (R. 202). This still resulted in a finding of no disability. (R. 204).

On July 12, 2005, L.D. saw Dr. James Lustig at the Children's Hospital of Wisconsin. (R. 221-23). L.D. was doing well during the day, but she had trouble breathing at night and would wake up snoring. (R. 221). Dr. Lustig stated that L.D.'s mild intermittent asthma was "controlled," and recommended that she have a sleep study to rule out apnea. (R. 223). Four days later on July 16, 2005, Dr. Milford Schwartz completed a Case Analysis on L.D. for the SSA. He noted that as of March 2005, L.D.'s physical growth and development were normal, and he agreed with Dr. Castaldo's assessment that she had "no more than marked limitations confined to a single domain, #6 [Health and Physical Well-Being]." (R. 205).

Plaintiff failed to take L.D. to a scheduled appointment on August 16, 2005, but in a September 29, 2005 request for a hearing before an ALJ, she claimed that L.D.'s asthma and development continued to be a "big issue," especially at night. (R. 49). When Plaintiff took L.D. for a follow-up visit with Dr. Lustig on December 20, 2005, L.D. was still doing fine during the day but struggling with snoring at night. Dr. Lustig assessed controlled moderate persistent asthma and scheduled L.D. for a sleep study in January 2006 to rule out apnea. (R. 218, 220). Nine days later, on December 29, 2005, L.D. had to be taken to the Lake Forest Hospital ER for acute asthma exacerbation. (R. 209-11). Dr. Mark Mass observed that L.D.'s asthma symptoms had been managed and "easily treated at home" with Albuterol, and described this episode as "a typical asthma attack" that was subsequently cleared and resolved. (R. 210-11).

L.D. had a sleep study on February 8, 2006, shortly before her third birthday. The results were abnormal, showing moderate to severe obstructive sleep apnea. (R. 206-08). Dr. Lynn A. D'Andrea recommended consideration of a repeat adenoidectomy and "additional management of [L.D.'s] nasal congestion or allergic rhinitis." (R. 207-08).

### 2. Age 3 to Age 6 (February 16, 2006 to February 16, 2009)

#### a. Age 3

On February 24, 2006, L.D. had a district preschool screening that raised concerns in the areas of behavior, fine and gross motor skills, visual perception, learning styles, language comprehension and expression, articulation and attention span. (R. 104, 123). L.D. passed her vision and hearing screening, but she was referred to the offices of the Special Education District of Lake County for "psychoeducational, speech/language, and physical therapy evaluations." (R. 123, 125). The resulting April 24, 2006 Individualized Education Plan ("IEP") was based on testing performed by a six-member Multidisciplinary Evaluation Team (the "IEP Team") on April 10, 11 and 17, 2006, and information provided by Plaintiff in a February 27, 2006 Case History and a telephone interview. (R. 123, 125).

The IEP Team found that L.D. was able to attend to a variety of activities in both a structured and unstructured setting, and that she was socially and verbally engaging. Her auditory and visual attending and visual scanning were appropriate, she demonstrated age appropriate receptive language skills, and she communicated using multi-word utterances. L.D. also showed age appropriate cognitive and pre-academic skills and gross and fine motor performance, and her play and social interaction skills were "developing nicely." (R. 129). L.D. did have some special needs, however.

9

In the area of Speech and Language Evaluation/Interpretation, L.D.'s receptive language was age appropriate, but her expressive language was "predominantly unintelligible beyond the 2-3 word level." (R. 126-27). Plaintiff reported that she could understand L.D. 30%-40% of the time, but intelligibility decreased to less than 30% for unfamiliar listeners. During the IEP evaluation, L.D. "could be understood less than 30% of the time, especially out of context and as length of response increased." (R. 127). The IEP Team indicated that L.D. needed to: (1) improve articulation skills; (2) improve oral motor awareness and function for speech sound production, sound sequencing, and words; and (3) continue medical follow-up of the conductive pathology. (R. 129). L.D.'s school presented Plaintiff with the IEP results during a conference on April 27, 2006. (R. 103-13). The Conference Summary Report noted that L.D. was "speech and language impaired" with moderate to severe variability in pre-academics. She needed role models for speech, intensive speech therapy, and a "multi-sensory approach to learning." (R. 106).

On June 20, 2006, Dr. Man completed a State of Illinois Department of Human Services Certificate of Child Health Examination for L.D. (R. 432-33). He noted that L.D. had asthma, awoke during the night from coughing, and was overweight and developmentally delayed in the area of speech and language. He approved L.D.'s participation in physical education and one year of interscholastic sports. (R. 433).

L.D.'s next significant medical record is from October 30, 2006, when Dr. Joseph E. Kerschner performed a uvulopalatopharyngoplasty ("UPPP")[1] and "KTP laser reduction of

---

[1]      UPPP is "a procedure used to remove excess tissue in the throat to widen the airway." (http://www.webmd.com/sleep-disorders/uvulopalatopharyngoplasty-for-snoring, last viewed on January 23, 2012).

[L.D.'s] inferior [nasal] turbinates." (R. 233). Dr. Kerschner explained that despite L.D.'s previous tonsillectomy and adenoidectomy, she still had ongoing obstructive sleep apnea which necessitated the additional procedure. (*Id.*).

On November 21, 2006, L.D.'s Speech/Language Pathologist, Christine Mitchell, M.A. CCC-Sp/L, reported that L.D. was receiving 90 minutes of speech/language therapy per week. L.D. exhibited a "moderately-severe speech delay," and her intelligibility was "significantly reduced especially when the context [was] not known." She was making progress, however, and Ms. Mitchell recommended that the therapy continue. (R. 241).

On December 4, 2006, L.D. saw Dr. Michael B. Levy of the Wisconsin Children's Hospital and Health System. Dr. Levy sent a report to Dr. Man stating that L.D.'s chest was essentially clear at that time, but that she was "obese." He put her on Pulmicort in place of Flovent and instructed Plaintiff to bring her back in about three months. (R. 460).

### b.    Age 4

On March 28, 2007, L.D. had another sleep study. The results were once again abnormal, showing evidence of severe obstructive sleep apnea. Dr. D'Andrea recommended that Plaintiff consider having L.D. use a nasal CPAP (continuous positive airway pressure) machine. (R. 238-40, 462-63). Dr. D'Andrea repeated that suggestion when L.D. returned for a follow-up visit on April 24, 2007. In a report to Dr. Man, Dr. D'Andrea stated that L.D.'s surgical options for treatment of her apnea had been exhausted, and she recommended another sleep study while L.D. was wearing a CPAP. (R. 465-66). Plaintiff took L.D. back to Dr. Levy on May 7, 2007. L.D. presented with some congested nasal mucosa but her chest was clear. Dr. Levy stated that overall L.D. had

been doing "fairly well," and he confirmed for Plaintiff the value of a sleep study with CPAP titration.  (R. 459).

Approximately one month later, on June 5, 2007, Ms. Mitchell prepared an addendum to her November 21, 2006 speech/language therapy report indicating that L.D.'s "speech/language delays significantly decrease[d] her intelligibility."  (R. 242).  Specifically, L.D.'s intelligibility was 60% when the context was known, but only 45% when the context was unknown.  At that time, intelligibility did not increase with repetition.  (*Id.*).  L.D. demonstrated limited ability to imitate words, and her "stimulability for the production of sounds" was also limited, though she showed slight improvement with "auditory, visual and tactile-kinesthetic cues from the speech/language pathologist."  (*Id.*).

L.D. had a sleep study with CPAP titration on July 5, 2007.  (R. 468-69).  The CPAP resolved the obstructive sleep apnea and Dr. D'Andrea indicated that L.D. would receive a CPAP unit to use at home.  (R. 469).  Dr. D'Andrea reported these findings to Dr. Man in a letter dated August 14, 2007, and informed him that L.D. would return for a follow-up evaluation in six months.  (R. 470-71).  She also observed that L.D. was starting preschool that fall.  (R. 470).

### c.    Age 5

Just after L.D. turned five, on February 18, 2008, she returned to Dr. Levy for a follow-up examination.  Her asthma was under "partial control" at that time, but there had been no ER visits or nighttime awakening.  (R. 458).  On April 22, 2008, L.D. had a follow-up visit with Dr. D'Andrea.  (R. 472-73).  Plaintiff told Dr. D'Andrea that L.D. was "doing quite well with the CPAP," was able to use it every night and wore it "throughout the entire night."  While wearing the CPAP, L.D. did not snore and her breathing was "quite

comfortable." (R. 472). Dr. D'Andrea recommended continued use of the CPAP and planned to see L.D. again in six months. (R. 473). When Plaintiff took L.D. back to Dr. Levy on August 18, 2008, her asthma symptoms remained "quite well controlled," she had not used any inhalers for more than a month, and her chest was clear. Dr. Levy diagnosed intermittent asthma, sleep apnea on CPAP, and parental concerns about weight and diabetes. (R. 457).

On September 3, 2008, when L.D. was entering kindergarten, she had a progression test showing that she was performing moderately below level in expressive language, visual memory and fine motor, and considerably below level in visual discrimination. (R. 424).

### 3. Age 6 to Age 8 (February 16, 2009 to February 16, 2011)

#### a. Age 6 (Kindergarten to Middle of First Grade)

By April 15, 2009, L.D. was performing as expected in receptive language and fine motor skills, and moderately above level in all other areas. (*Id.*). L.D.'s kindergarten teacher completed a Pupil Growth Report stating that L.D. was developing appropriately and should be promoted to first grade. The teacher described L.D. as a "very capable student" who made "super progress in reading and math" throughout the school year. (R. 425–26). However, L.D. needed more time to develop socially in the areas of accepting rules and routines, working/playing well with others, respecting authority, demanding a normal share of attention, and practicing self-control. (R. 425). The teacher wrote that "[i]f we could just stop the crying every day would be great." (R. 426).

On August 31, 2009, L.D. saw Dr. Levy for a one-year follow-up exam. Plaintiff reported that L.D. was "doing fine," and Dr. Levy diagnosed stable asthma, history of sleep

apnea and obesity. (R. 453-56, 477-81). L.D. also had a follow-up visit with Dr. D'Andrea on September 22, 2009. Plaintiff told Dr. D'Andrea that L.D. did well with the CPAP, put it on every night and wore it through most of the night. According to Plaintiff, L.D. exhibited a "rare soft snoring," but "overall appear[ed] quite comfortable." (R. 474). A Pulmonary Function Report showed only mild obstruction of the small airways that responded well to a bronchodilator. (R. 482). Dr. D'Andrea recommended that L.D. have another sleep study with CPAP titration now that she was a couple of years older. (R. 475).

L.D. entered first grade in the fall of 2009, and on October 29, 2009, she took a STAR Reading computer-adaptive reading test. (R. 405). Her teacher prepared a Parent Report for Plaintiff showing that L.D. was at a slightly above average reading level. (R. 405-07). Shortly thereafter, on November 6, 2009, Plaintiff agreed to allow L.D.'s school to perform a full case study evaluation of her daughter. L.D. had "c[o]me to the attention of the [P]roblem [S]olving [T]eam" at her school because although her academics were "well above average," she was a "high maintenance person" in the classroom and was "chronically disobedient and disrespectful on a daily basis." (R. 393-94). Plaintiff was concerned about L.D.'s ability to advance to second grade because she kept getting into serious trouble, and the first-grade teacher was frustrated by L.D.'s constant interruptions and defiant and oppositional behavior. (R. 393-94).

After evaluating L.D., Joan M. Coleman Almond, MSW, noted that she was discouraged and frustrated in the first grade, and lacked "the insight and internal locus of control in the classroom, in the hall, or any where in the school community." L.D. enjoyed school but needed and/or demanded so much attention that her interactions with classmates and adults were not positive. Ms. Almond concluded that the school had

14

"exhausted the interventions thus far," and stated that L.D. "would benefit from social work regarding separation and loss, boundaries, frustration and anxiety." (R. 394).

On November 13, 2009, L.D. received a Bus Conduct Report indicating that she was always hitting kids on the bus, making them afraid of her. She also behaved rudely and used unacceptable language. On November 16, 2009, L.D. received another Bus Conduct Report stating that she had smacked a student on the face. The bus driver noted that this was "not the first time" something like that had happened, and again cited L.D. for rudeness and unacceptable language. (R. 402). Shortly thereafter, on December 7, 2009, the school's Problem-Solving Team requested a special education evaluation for L.D. due to her poor academic performance and social/emotional behavioral concerns. (R. 400).

L.D. received a 2-day suspension from school on January 8, 2010 because she was physically aggressive in class and she hit and kicked another child. (R. 422). Less than two weeks later, on January 20, 2010, the school's Director of Special Education reported that L.D. needed to be re-evaluated "to determine eligibility for special education placement and services, specifically, learning disability." (R. 400). On February 19, 2010, L.D. received another 2-day suspension for "gross disobedience and misconduct." (R. 397). On this occasion, L.D. hit, threw blocks at, and pushed other children, refused to complete her assignment papers, and became so unruly that the teacher had to call security because she was scaring the other students. (R. 398-99).

15

### b.    Age 7 (Middle of First Grade to Second Grade)

In February 2010, Ruth Blameuser, OTR/L, conducted an occupational evaluation of L.D.  In her summary report, Ms. Blameuser noted that L.D. had "sensory processing dysfunction that significantly affect[ed] her ability to control her behavior in the classroom and other school settings."  (R. 392).  This included "banging, leaning or slamming her body into things like wal[l]s, furniture, or lockers." (*Id*.).  Ms. Blameuser recommended attaching a piece of Velcro under L.D.'s desk that she could touch to calm herself down; giving L.D. "[d]ynamic seating" to help her stay at her desk and on task; minimizing visual and auditory distractions; clearing visual boundaries such as boldly colored tape; and using "multi-sensory, highly structured, consistent, and repetitive teaching and organizational strategies in the classroom." (*Id*.).

On February 24 and March 3, 2010, the school psychologist, Dennis Petrowsky, conducted a Full and Individual Evaluation of L.D. due to an increase in negative behaviors and aggressiveness towards peers and staff.  (R. 440).  Mr. Petrowsky found it "safe to assume" that L.D. had "at least average intelligence," but noted concerns with her social functioning and level of happiness.  (R. 442-43).  L.D. told Mr. Petrowsky that she was afraid that something might happen to her family members and had scary dreams.  Mr. Petrowsky described her as "a very anxious child" who "exhibits little problem solving skills." (R. 443-44).

L.D. was suspended again on March 10, 2010, this time for three days.  She was cited for "[g]ross misconduct" and repeated rule violations, including "constantly being disrespectful and hitting her teachers and not listening."  (R. 396).  Eight days later, on March 18, 2010, Speech-Language Pathologist Izreal Cary, M.S., CCC-SLP, prepared a

16

Speech-Language Re-evaluation Report on L.D. (R. 389-90). At that time, her expressive language and comprehension were "mildly compromised by her reduced use of specific vocabulary." (R. 390). Her "social use of language (pragmatics)" also was "mildly reduced," and "[f]rom time to time she demonstrate[d] weaknesses in the syntactical complexity of her expressive language." Mr. Cary indicated that L.D. would benefit from direct speech and language services, recommended that she be immersed in a "vocabulary enriching environment at school and at home," and suggested that she "improve her articulation and syntactical skills in conversation." (*Id.*).

The next day, on March 19, 2010, L.D.'s IEP Team prepared an "Individualized Education Program (Conference Summary Report)" summarizing all of L.D.'s tests and evaluations. (R. 364-88). They concluded that L.D. had an "Emotional Disability" that caused her "great difficulty with relationships [with] adults [and] peers." (R. 366). L.D. exhibited poor impulse control and resultant fear, she bullied other children, and she was defiant, oppositional and physically aggressive and hostile to peers and adults. (R. 366, 370). In addition, L.D. was frequently disruptive and unable to follow school rules, and even minor provocations led to "extreme rage." The IEP Team believed that L.D. "appear[ed] to suffer from significant social/emotional disturbance affecting all areas of learning." (R. 372). In a smaller setting, however, L.D. could be attentive and affectionate. (R. 372, 375).

L.D.'s Behavioral Intervention Plan included teaching her about impulse control, anger management and full compliance. (R. 375). The IEP Team placed her in a small ED Instructional Classroom (for children requiring special education services), explaining that:

> Due to the severity of physical aggression and verbal abuse toward staff and peers[,] an instructional classroom was deemed most suitable. [L.D.'s] behaviors interfere with the teacher's ability to teach and the other students' ability to learn. They have expressed fear of her.

(R. 383). To accommodate L.D.'s need for a smaller class size, she was transferred to a different school in the spring of 2010 that had a special education ("ED") program. (R. 505-06). Her "primary Handicapping condition" was emotional disability, but she still qualified for speech and language services. (R. 395, 444).

Before the transfer and halfway through L.D.'s first grade year, her teacher prepared a Pupil Growth Report. (R. 403-04). L.D. lacked self-control, frequently refused to follow directions, and "exhibited lying, stealing, disrespect and physical aggression to others." (R. 404). Her performance was average in reading, math, English/writing, science/health and social studies, but she was failing in the areas of conduct and following directions/listening. (R. 423). After L.D. was transferred into the smaller classroom at the new school, however, her new teacher described L.D. as a "very bright student" with excellent academic work, especially in reading. L.D. spent more time worrying about herself instead of focusing on others, though she still needed reminders to keep her hands and feet to herself. (R. 419-20). She also needed more time to develop in the areas of respecting the rights and feelings of others, demonstrating self-control, following rules, assuming responsibility and working without disturbing others. (R. 419). Ms. Massong recommended that L.D. be promoted to second grade. (R. 420).

**B.      Plaintiff's Testimony**

At the September 21, 2010 hearing, Plaintiff testified that L.D.'s behavioral and emotional problems really became significant in first grade. (R. 491). She was suspended many times until she was placed in an ED classroom in the spring of 2010, where she spent most of the day with just four other children. (R. 492-94, 501). L.D. adjusted well to the new classroom; her grades improved and she no longer got suspended. (R. 494, 502). In fact, she was "too fast" intellectually for the ED classroom, and Plaintiff indicated that L.D. would finish her work quickly and then become bored with nothing to do. This, in turn, led to behavior issues. (R. 500).

As a second grader, L.D. had a couple of problems on the bus, but after the driver started making her sit in the front, Plaintiff stopped receiving calls from the school. (R. 493). L.D. had joined Girl Scouts and had a lot of friends at the first school, but knew fewer children at the new school. (R. 498-99). She liked to go bowling, play Wii games, color and watch television. (R. 499). She could take a bath, dress herself, brush her teeth, clean her room and help with the dishes with reminders. (R. 503-04). L.D. argued and bickered with her siblings, but she mostly got along with the sister with whom she shared a room, and she liked spending the night at her cousin's house. (R. 504-05). She attended day camp during the summer of 2010 and was only written up once because she really liked the field trips and activities. (R. 506-07). Plaintiff told the ALJ that L.D.'s behavior in second grade was improving a little bit, but she continued to be bored when she finished her schoolwork and then started talking and running around. (R. 505, 507).

Plaintiff testified that L.D.'s sleep apnea was under control with the CPAP, which she wore about 90 percent of the time, and that her asthma was under control with Singulair

19

and Albuterol. (R. 495-96, 508). She no longer needed a nebulizer and was able to participate in gym classes without restriction, using her inhaler only as needed. (R. 496-97). L.D. continued to participate in speech/language therapy, but the only area where she really had problems was with her conduct. (R. 520-21).

## C.     L.D.'s Testimony

L.D. testified that it was easier to pay attention in the smaller classroom and she was doing "good" in school. (R. 512). She had 10 friends, played on the playground and outside, participated in gym class, went swimming and jumped rope. (R. 513, 516-17).

## D.     Medical Expert Testimony

Dr. Sai Nimmagadda testified at the hearing as an ME. He stated that L.D. suffers from a history of asthma, sleep apnea, oppositional defiant disorder ("ODD"), speech and language impairment, and obesity, but that she does not meet or equal any listing, including 103.03 (asthma/apnea) or 112.08 (ODD). (R. 522-23). In the ME's opinion, L.D. has a less than marked limitation in all domains of functioning except interacting and relating with others, in which she demonstrates a marked limitation. (R. 523). The ME explained that L.D. was doing relatively well in school, "at least keeping on track and on pace with a smaller classroom." (R. 524). She did not have any problems attending day camp and could complete most of her activities of daily living aside from doing her hair. In addition, her asthma was well controlled and she was using a CPAP for her sleep apnea. (R. 524-25).

L.D.'s limitation in interacting and relating with others manifested itself as physical abuse towards peers and siblings, and impulse control problems. The ME found that L.D. did not have an extreme limitation in this area because she was "doing better with the

20

smaller school setting" and having fewer outbursts, and had not been suspended at all after moving to the new school. (R. 524). In addition, there were always times when she could "get refocused" and complete tasks. (R. 540).

In response to questioning from Plaintiff's attorney, the ME indicated that L.D. may have had an extreme language limitation for some closed period, but by 2006 her speech had improved with therapy. (R. 529-30). The ME acknowledged that the June 2007 report from Christine Mitchell stated that L.D. was intelligible less than 50% of the time, but he maintained that she still had only a marked limitation because she had improved over time. (R. 531, 536-37). With respect to the domain of caring for yourself, the ME noted that L.D. was able to bathe herself and get dressed. He acknowledged that L.D. used a velcro strip under her desk to try and calm down when she felt angry or upset, and concluded that she had a marked limitation in the area of sensory processing. (R. 538-39). The ME considered the fact that L.D. reacted to minor provocations with extreme rage, but he found it significant that she did not sustain any injuries as a result of her anger, and that she was able to attend summer camp. (R. 539). The ME also stressed that in the smaller class setting, L.D. was no longer getting suspended. (R. 540).

## E.    The ALJ's Decision

The ALJ found that L.D. was a school-age child who had not engaged in any substantial gainful activity since she applied for benefits on November 1, 2004. (R. 275). L.D. has a history of asthma, sleep apnea, obesity, a mild speech and language impairment, and ODD present since 2009, but none of these severe impairments meets or medically equals any listing. (*Id.*). The ALJ explained that L.D.'s sleep apnea is controlled

with the CPAP, her asthma is controlled with medication, and her ODD does not result in any "listing level limitation." (R. 275-76).

The ALJ next concluded that L.D. does not have an impairment or combination of impairments that functionally equals the listings. In reaching this conclusion, the ALJ gave substantial weight to the ME's opinions, which she characterized as "well-informed." She also gave considerable weight to the opinions of the State agency medical consultants. (R. 280). The ALJ divided her discussion into two parts. She first addressed L.D.'s limitations from November 1, 2004 through August 31, 2009, which was before she started exhibiting ODD. The ALJ then considered L.D.'s impairments from September 1, 2009 through the date of the decision. This opinion focuses on the domains that are in dispute for purposes of appeal.

### 1. November 1, 2004 - August 31, 2009

In the domain of interacting and relating with others, the ALJ found L.D. to have a less than marked limitation based on Plaintiff's testimony that L.D. would play alongside other children, interact, and communicate her needs and wishes with gestures. In addition, school officials described L.D. as a pleasant, friendly and fun-loving child who liked to play. The ALJ acknowledged that as of April 2006 L.D.'s intelligibility was in the 30-40% range, but observed that even at that time she "remained capable of expressing herself using multi-word utterance[s] and her receptive language was adequate and age-appropriate." (R. 279, 284). The ALJ also noted that by November 2006, L.D.'s intelligibility had increased to 60%. (R. 279, 284).

With respect to caring for yourself, the ALJ found that L.D.'s limitation was less than marked because she could drink from a cup and feed herself with utensils, was cooperative

with self care, could dress herself, had independent toileting skills, and exerted her independence. (R. 279, 286). The ALJ stressed that according to Plaintiff, L.D. was easily distracted and fatigued, but also "intelligent and smart." Upon psychological evaluation, moreover, L.D.'s social interaction skills and cognitive functioning were largely age-appropriate. (R. 279).

### 2. September 1, 2009 to October 5, 2010

The ALJ next determined that as of September 1, 2009, L.D. had a marked limitation in interacting and relating with others due to her ODD. (R. 287). The ALJ noted that L.D.'s first grade IEP report reflected that she had poor impulse control, emotional instability and chronic disobedience, which inhibited her ability to stay on task. She also bullied other children and was verbally and physically aggressive towards peers and adults, and exhibited sensory dysfunction affecting her ability to control her behavior. (R. 280). Nevertheless, L.D. did not require any occupational therapy for the sensory dysfunction, she was able to perform at an average or above average range on her schoolwork, she joined the Girl Scouts, and she had a lot of friends despite being a bully. (R. 280, 287). Once L.D. was placed in the smaller school setting, she did not demonstrate behavior issues "except for two instances where she talked back to her teacher." (R. 287). The ALJ found it significant that L.D. did not receive any suspensions in 2010, and got only one write-up from summer camp. In addition, Plaintiff testified that L.D. argued with her siblings but mostly "gets along," and L.D. testified that she has friends she plays with on the playground. (*Id.*).

In the domain of caring for yourself, the ALJ found that L.D. had a less than marked limitation after August 31, 2009. Despite her asthma, she could take baths, brush her teeth, keep her room clean, and help with dishes with reminders. (*Id.*).

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether the claimant is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

24

**B.      Framework for Child SSI Benefits**

A child is disabled within the meaning of the Social Security Act if she has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I).  In determining whether a child meets this definition, the ALJ engages in a three-step analysis: (1) if the child is engaged in substantial gainful activity, then her claim is denied; (2) if the child does not suffer from a severe impairment or combination of impairments, then her claim is denied; and (3) the child's impairments must meet, medically equal, or be functionally equal to any of the Listings of Impairments contained in 20 C.F.R. pt. 404, subpt. P, App. 1.  20 C.F.R. § 416.924(b)-(d).  *See also Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007).

To determine whether an impairment functionally equals a listing, the ALJ must assess its severity in six age-appropriate categories: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  Each domain describes what a child should be able to do throughout five age categories:  (1) "newborns and young infants" (birth to age 1); (2) "older infants and toddlers" (age 1 to age 3); (3) "preschool children" (age 3 to age 6, including children in kindergarten but not first grade); (4) "school-age children" (age 6 to age 12, including children in first grade through middle school); and (5) "adolescents" (age 12 to age 18).  20 C.F.R. § 416.926a(g)(2), (h)(2), (i)(2), (j)(2), (k)(2), (l)(2).

An impairment functionally equals a listing if it results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain.   The functional

25

equivalence analysis requires the ALJ to consider how the child functions as a whole. "[T]his consists of looking at all of the child's activities, which include everything the child does at home, at school, and in her community, and evaluating how the child is limited or restricted in those activities, without cabining the child's impairments into any particular domain." *Bielefeldt ex rel. Wheelock*, No. 09 C 50302, 2011 WL 3360013, at *4 (N.D. Ill. Aug. 4, 2011) (citing 20 C.F.R. § 416.926a(b)-(c)).

## C.    Analysis

Plaintiff argues that the ALJ's decision must be reversed because of numerous errors in analyzing two domains of L.D.'s functioning: interacting and relating with others, and caring for yourself.  In addition, Plaintiff contends that the ALJ violated the law of the case doctrine in finding that L.D. had less than marked limitation in the domain of health and physical well-being.  Finally, Plaintiff asserts that the ALJ erred in failing to make a credibility determination regarding Plaintiff's testimony.  The Court considers each in turn.

### 1.    Interacting and Relating With Others

The domain of interacting and relating with others considers how well a child is able to develop and use language, comply with rules and respond to criticism.  A preschool-age child (age 3 to 6) should start to make friends, play cooperatively with other children, and "initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what [she] say[s] most of the time."  20 C.F.R. § 416.926a(i)(2)(iii).  A school-age child should be able to develop more lasting friendships, work in groups, and have "an increasing ability to understand another's point of view and to tolerate differences."  The

child should also be able to "speak in a manner that both familiar and unfamiliar listeners can readily understand." 20 C.F.R. § 416.926a(i)(2)(iv).

### a. Speech and Language Impairment

Plaintiff argues that the ALJ erred in finding that L.D. had neither a marked nor extreme limitation in speech and language. A child's speech is evaluated using four age categories: (1) birth to age 2; (2) age 2 to age 3 ½; (3) age 3 ½ to age 5; and (4) age 5 and older. SSR 98-1p. Under SSR 98-1p, a child between the ages of 3 ½ and 5 has a marked speech limitation if the following is true:

> a. Sounds, omissions, distortions, or phonological patterns, **or** fluency (rate, rhythm of speech) are not typical for this group; **or** [there are] significant aberrations in vocal pitch, quality, or intensity; **and**
>
> b. Conversation is intelligible no more than ½ of the time on first attempt; **and**
>
> c. Intelligibility improves with repetitions.

SSR 98-1p, at *10 (emphasis in original). A child in this age range has an extreme speech limitation if:

> a. Criteria a. and b. for Marked Limitation are met, **and**
>
> b. Conversation continues to be intelligible no more than ½ of the time despite repetitions, **and**
>
> c. Stimulability for production of sounds is limited, **or**, ability to imitate words is limited.

*Id.* (emphasis in original).

### i.    June 2007 Report

Plaintiff first argues that the ALJ committed reversible error because she misstated the date of Ms. Mitchell's most recent speech/language therapy report. Specifically, the ALJ stated that in November 2006, Ms. Mitchell found L.D.'s intelligibility to be 60% in a known context. (R. 279). In fact, the report containing this statement is dated June 5, 2007. (R. 242). Plaintiff finds this error significant because in April 2006, L.D.'s IEP Team determined that she was intelligible at most 30%-40% of the time in both known and unknown contexts. (R. 127). As a result, Plaintiff argues, the April 2006 report showed an extreme limitation in speech, and there is "a question of whether L.D. met the 12-month durational requirements for an extreme limitation under SSR 98-1p." (Doc. 26, at 8; Doc. 41, at 1).

Defendant responds that Plaintiff is improperly mixing age categories by referring back to April 2006. At that time, L.D. was only 3 years and 2 months old, placing her in the age 2 to age 3 ½ category. A child in that age range has an extreme limitation if (a) she meets the criteria for a marked limitation; and (b) gesturing and pointing are used most of the time instead of oral expression; and (c) intelligibility does not improve even with repetition or models, or ability to imitate words is limited. SSR 98-1p, at *10. Defendant argues that there is no evidence that L.D. used mostly gestures and pointing as of April 2006, as required for an extreme impairment in the 2 to 3 ½ year age range. (Doc. 37, at 8).

The Court agrees with Plaintiff that the ALJ said nothing about gesturing and pointing, suggesting that Defendant is attempting to defend the ALJ's decision on grounds that she did not herself articulate. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)

28

(*Chenery* "forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") Contrary to Plaintiff's suggestion, however, there is no evidence that the ALJ found – or should have found – the April 2006 report reflective of an extreme limitation in L.D.'s speech. The ALJ stated that although L.D.'s intelligibility was well below 50% at that time, she "remained capable of expressing herself using multi-word utterance[s] and her receptive language was adequate and age-appropriate . . ., thereby failing to establish insufficient consonant-vowel repertoire to support development [o]f expressive language, as required for 'extreme' limitation." (R. 279). Plaintiff makes no mention of this finding and offers no explanation as to why it is either inaccurate or insufficiently detailed to support the ALJ's conclusion that L.D. had a less than extreme limitation in the area of speech while in the 2 to 3 ½ age range. Nor is there any evidence that as of April 2006, L.D., who was able to use multi-word utterances, was in fact using gesturing and pointing "most of the time instead of oral expression" as required to demonstrate an extreme limitation. SSR 98-1p, at *10; (R. 129). This seriously undermines Plaintiff's theory that L.D. met the 12-month durational requirement for a severe limitation starting in April 2006.

There can be no dispute that the ALJ misstated the date of the June 2007 report. The Court is not convinced, however, that the ALJ would have reached a different conclusion regarding L.D.'s speech impairment if she had utilized the correct date. *See Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); *Scott v. Astrue*, 730 F. Supp. 2d 918, 935 (C.D. Ill. 2010) ("Harmless errors are those that do not affect the ALJ's

determination that a claimant is not entitled to benefits.")  Plaintiff's request for a remand based on the misstated report date is denied.

### ii.    Known v. Unknown Context

Plaintiff next argues that the ALJ erred in limiting her evaluation of L.D.'s speech intelligibility to the known context.  As of June 2007, L.D. was intelligible 60% of the time when the context was known, but only 45% of the time when the context was unknown. In addition, intelligibility did not increase with repetition.  (R. 242).  The ALJ observed that SSR 98-1p "does not appear to limit evaluation to only unknown context of speech," and then focused on L.D.'s 60% intelligibility in the known context without even mentioning the 45% intelligibility in the unknown context.  (R. 279).  Plaintiff claims that this was improper because the ALJ failed to consider and explain why she ignored evidence favorable to L.D.'s claim.  (Doc. 26, at 9-10).

Defendant disagrees, noting that the ALJ did acknowledge L.D.'s 30% intelligibility rate in the unknown context as of April 2006.  (Doc. 37, at 9).  Of course, this does not speak to L.D.'s subsequent intelligibility rate in June 2007.  Defendant also directs the Court to the language of SSR 98-1p.  (*Id.* at 9-10).  The Ruling provides that intelligibility means "the degree to which the child can be understood by the listener," and "[r]atings of intelligibility should be evaluated with respect to the familiarity of the listener with the child and the frequency of contact."  It is important to remember, however, that "[r]atings of intelligibility by unfamiliar listeners for whom the topic of conversation is unknown assume increasingly greater importance as children age."  The Ruling explains that:

> Young children typically talk about what is immediately present in their environment, and listeners may be able to use external clues to understand such children's speech.  As children age, however, the topics of their

> conversation should become less embedded in the immediate physical
> context (e.g., they talk about past or future events); the unfamiliar listener,
> therefore, has fewer clues available for understanding the child's speech.
> The older a child becomes, the more intelligible he/she needs to be in school
> and social situations with infrequent listeners or strangers.

SSR 98-1p, at *8-9.

Defendant argues that these statements demonstrate "the ALJ reasonably relied more heavily on the fact that [L.D.] had 60% intelligibility in a known context" in finding that she did not have a marked or extreme limitation of speech. (Doc. 37, at 9-10). Plaintiff insists that "the ALJ committed reversible error by failing to even acknowledge both contexts." (Doc. 41, at 3). Neither party cites to any supporting authority for these propositions, and SSR 98-1p does not delineate how important the unknown context is for specific age groups.

As of June 2007, L.D. was not quite 4 ½ years old and had not yet started preschool. The Court doubts that the need to be understood in an unknown context is of particular importance to a child this age. Moreover, SSR 98-1p states that for an extreme limitation, a child must be intelligible "*no more than ½ of the time.*" Here, L.D.'s intelligibility 60% of the time in the known context easily exceeds that threshold. Nevertheless, the ALJ did not provide any rationale for completely ignoring L.D.'s 45% intelligibility rate in the unknown context. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("[T]he ALJ is not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion.")

It is clear that L.D.'s speech was improving over time, and it may well be that her 45% intelligibility rate in the unknown context is not sufficient to constitute a disability here. On the record presented, however, the Court cannot determine whether the ALJ fairly

31

considered this evidence in finding that L.D. had a less than marked limitation in her speech prior to September 1, 2009. This is also true with respect to certain findings in Ms. Mitchell's report that were not mentioned in the ALJ's opinion. Specifically, the report said L.D. had limited "stimulability for the production of sounds" and "ability to imitate words," which are factors that support a finding of an extreme speech limitation. (R. 242). The report also noted that L.D., who had by then advanced to the 3 ½ to 5 age range, exhibited a "moderately-severe speech delay characterized by consonant blend reduction . . .; stopping . . .; final consonant deletion . . .; and fronting." (R. 241). This Court expresses no opinion as to the significance of such evidence but the case must be remanded to ensure that the ALJ considered this evidence together with the other evidence described in the opinion.

### iii.    ME's Testimony

Plaintiff next argues that the case should be remanded because the ALJ failed to resolve inconsistencies in the ME's testimony. At the September 21, 2010 hearing, the ME testified that L.D. had a mild speech and language impairment from 2004 to 2006. (R. 526). He first stated that he was aware of SSR 98-1p and that he considered L.D.'s speech impairment in the context of that Ruling. (R. 526, 528). Later in the hearing, the ME said that he did not have the Ruling in front of him, prompting Plaintiff's attorney to read him the portion relating to extreme speech limitations for children aged 3 ½ to 5. (R. 537). The ME then conceded that he had not in fact reviewed that section of SSR 98-1p. (R. 538). Plaintiff's attorney objected to the ME's testimony given his lack of familiarity with the pertinent section of the Ruling, but the ALJ overruled the objection because the attorney had just read it to him. (*Id.*).

32

The ALJ gave the ME's opinion "substantial weight" and described it as well-informed. She did not, however, mention the ME's changed testimony regarding his familiarity with SSR 98-1p. (R. 280). Plaintiff argues that once her attorney questioned the reliability of the ME's testimony, the ALJ had a duty to "make an inquiry (similar though not necessarily identical to that of Rule 702) to find out whether the purported expert's conclusions are reliable." *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). Defendant maintains that the ALJ elicited a significant amount of testimony on direct examination and during counsel's cross-examination, and did not need to delve any further into the ME's testimony. (Doc. 37, at 11-12). Defendant also stresses that the ME never stated that L.D. met or functionally equaled a listing in the area of speech. (*Id.* at 11).

Given that the case is already being remanded for further analysis, the ALJ should take the opportunity to ensure that the ME was familiar with SSR 98-1p and that he considered L.D.'s speech impairment in the context of that Ruling when formulating his opinion.

### b. Oppositional Defiant Disorder

The ALJ found that from September 1, 2009 through the date of her decision, L.D. had a marked limitation in the domain of interacting and relating with others due to her ODD. (R. 287). Plaintiff claims that the ALJ's assessment is flawed because she ignored key evidence and improperly compared L.D. to children with impairments.

### i. Discussion of the Evidence

Plaintiff first insists that the ALJ failed to address significant evidence that supported a finding that L.D. had an extreme limitation in her ability to interact and relate with others. (Doc. 26, at 12-13). The Court disagrees. A careful review of the record demonstrates that

the ALJ actually discussed L.D.'s ODD and behavior problems in detail.  For example, the ALJ noted that L.D.'s March 2010 IEP report stated that she "disrupt[ed] the classroom with poor impulse control, emotional instability and chronic disobedience, inhibiting her ability to stay on task and causing easy distraction."  (R. 280).  The ALJ also observed that L.D. bullied other children and was verbally and physically aggressive towards peers and adults. The ALJ reported that L.D. had received multiple suspensions and disciplinary actions during the 2009-2010 school year, and that she spent more than 80% of her time in special education.  (*Id*.).

In another paragraph, the ALJ noted that an occupational therapy evaluation showed L.D. to have sensory dysfunction affecting her ability to control her behavior, but the ALJ also found it significant that "no need for occupational therapy was indicated."  (*Id*.).  L.D. was able to be affectionate one-on-one and cooperative in small groups, and school psychologist Dennis Petrowsky indicated that he was easily able to establish rapport with her.  (*Id*.).  The ALJ concluded that these facts "negate an extreme limitation in [L.D.'s] ability to interact and relate with others."  (*Id*.).

Plaintiff argues that though the ALJ mentioned these facts "in her general discussion of L.D.'s symptoms," she did not build an accurate and logical bridge to her ultimate conclusion because she did not discuss the symptoms again seven pages later "in her analysis under the interacting and relating with others domain."  (Doc. 26, at 12).  In that section, the ALJ noted that L.D. had joined the Girl Scouts, had a lot of friends despite being a bully, was doing much better in the smaller school setting and received no suspensions there, attended summer camp with only one write-up, and argued but mostly got along with her sibling.  (R. 287).  "Rather than nitpick the ALJ's opinion for

34

inconsistencies or contradictions, we give it a commonsensical reading." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Viewed as a whole, the ALJ clearly considered L.D.'s behavior problems in determining that she had a marked limitation in interacting and relating with others.

Plaintiff disagrees, arguing that *Murphy v. Astrue*, 496 F.3d 630 (7th Cir. 2007), establishes that the ALJ's analysis is lacking. (Doc. 41, at 5). In *Murphy*, the ALJ found the child not disabled based on school records indicating that he "did not talk excessively, did not interrupt or intrude, did not move about unexpectedly, knew the answers to questions when called upon, was cooperative, had a good sense of humor, tried to follow rules, and wanted to do well in his studies." 496 F.3d at 634-35. The ALJ did not, however, discuss other evidence that supported a finding of disability, such as that the child: had trouble completing work due to deficits in attention span, concentration and on-task behavior; lost things; worked slowly, struggling to finish assignments and turning in incomplete work; failed to pay attention to details; and avoided or struggled with tasks requiring sustained mental effort. *Id.* at 634. The Seventh Circuit held that the ALJ should have explained why the child's sense of humor, desire to do well and follow rules, and ability to not interrupt or move about unexpectedly "trump[ed] the evidence of his inability to attend and complete tasks." *Id.* at 635.

Plaintiff contends that as in *Murphy*, the ALJ in this case failed to explain why, for example, "L.D. establishing rapport with a school psychologist trumps L.D.'s inappropriate classroom behaviors, aggressive bullying actions, and multiple suspensions with disciplinary actions." (Doc. 41, at 5). The comparison is inapt because the ALJ in this case discussed all of the available evidence, whereas the ALJ in *Murphy* simply ignored

important facts indicative of disability without explaining why he gave them no weight. The ALJ fairly considered L.D.'s severe behavioral problems and explained why they caused only a marked limitation in this case.

## ii. Comparison to Children Without Limitations

Plaintiff contends that the case still requires remand because the ALJ improperly compared L.D. to other children with impairments. In determining whether a child has a marked or extreme limitation in any domain, the ALJ must "begin by considering how the child functions every day and in all settings compared to other children the same age who do not have impairments." SSR 09-1p, at *2. *See also* 20 C.F.R. § 416.926a(f)(1). The ALJ found it significant that L.D. had "not had recent behavior issue[s] since placement in the special smaller school setting, except for two instances where she talked back to her teacher." (R. 287). In addition, the ME testified that L.D. had only a marked limitation in interacting and relating with others after September 1, 2009 because "she apparently is doing better with the smaller school setting." (R. 524).

Plaintiff contends that the ALJ and the ME committed reversible error by relying on the fact that L.D.'s behavior improved in a smaller school setting where all of the children had impairments like L.D. (Doc. 41, at 5-6). The Court disagrees. The regulations contemplate that some children may require a supportive or structured setting, such as a special classroom. 20 C.F.R. § 416.924a(b)(5)(iv)(B). Such a setting:

> may minimize signs and symptoms of your impairment(s) and help to improve your functioning while you are in it, but your signs, symptoms, and functional limitations may worsen outside this type of setting.

20 C.F.R. § 416.924a(b)(5)(iv)(C). Thus, even if a child is able to function adequately in a structured or supportive setting, "we must consider how you function in other settings and

whether you would continue to function at an adequate level without the structured or supportive setting." *Id.* The "other settings" include "home, school, and in the community." SSR 089-1p, at *3.

Here, the ALJ acknowledged that since approximately the spring of 2010, L.D. has spent more than 80% of her day in a special education classroom. (R. 280, 492-93). The ALJ concluded, however, that this did not reflect an extreme limitation in interacting and relating with others because L.D. also: demonstrated above average academic scores despite her difficulties staying focused; did not require occupational therapy despite some sensory dysfunction; was affectionate one-on-one; was attentive at times and cooperative in small groups; established easy rapport with the school psychologist; joined the Girl Scouts; had a lot of friends at her old school despite being a bully there; mostly got along with her sibling; and attended summer camp. (R. 280, 287). Viewed as a whole, the Court is satisfied that the ALJ fairly considered L.D.'s functioning in the special classroom and in other relevant settings in finding that she had a marked limitation in interacting and relating with others from September 1, 2009 through the date of the decision.

Plaintiff makes much of the fact that the ALJ accorded substantial weight to the ME's opinion, objecting that he, too, cited the smaller school setting as a basis for finding only a marked limitation. (Doc. 41, at 6; R. 280). Regardless, the ALJ provided a more thorough explanation for her decision that is supported by substantial evidence. On the record presented, the Court is not persuaded that the ALJ erred with respect to SSR 09-1p.

## 2. Caring for Yourself

Plaintiff next finds error in the ALJ's conclusion that L.D. has a less than marked limitation in the domain of caring for yourself. This domain considers how well a child maintains "a healthy emotional and physical state," "cope[s] with stress and changes in [the] environment," and is able to take care of personal "health, possessions, and living area." 20 C.F.R. § 416.926a(k). A school-age child (age 6 to age 12) "should be independent in most day-to-day activities," and "should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior." The child should also "begin to demonstrate control over [her] behavior," and "be able to avoid behaviors that are unsafe or otherwise not good for [her]." 20 C.F.R. § 416.926a(k)(iv).

### a. Comparison to Children Without Limitations

Plaintiff once again objects that the ME improperly compared L.D. to children with impairments in contravention of SSR 09-1p. Plaintiff's attorney asked whether the ME considered L.D.'s suspensions and physical aggression towards others in assessing the caring for yourself domain. The ME responded that "I consider that to be marked, but when she's placed in the appropriate setting, which is a smaller class size, she's now functioning well." (R. 539-40). Based on this exchange, Plaintiff argues that the ME improperly concluded that she had a less than marked limitation only when compared with other impaired children.

In the Court's view, the attorney's question reflects a misunderstanding of SSR 09-7p. That Ruling explains that the caring for yourself domain "involves a child's feelings and behavior in relation to self (as when controlling stress in an age-appropriate manner)." Conversely, "a child's feelings and behavior in relation to other people (as when the child

38

is playing with other children, helping a grandparent, or listening carefully to a teacher)"
implicates the separate domain of interacting and relating with others. SSR 09-7p, at *4.
Here, the attorney asked about suspensions for hitting other people, which clearly relates
to the domain of interacting and relating with others, and not caring for yourself. Elsewhere
in his testimony, the ME explained that the latter domain involves activities such as bathing,
dressing and feeding oneself, which are all things L.D. is generally capable of doing. (R.
538). The ME also observed that L.D. did not present with any injuries, such as bruises,
cuts or falls, indicating that she was not having trouble caring for her physical well-being.
(R. 539).

The Court finds that the ME did not err in his analysis of the caring for yourself
domain, and Plaintiff's contention that he improperly compared L.D. to other impaired
children in violation of SSR 09-1p is without merit.

### b. Combination of Impairments

Plaintiff also argues that the ALJ erred in failing to adequately consider all of L.D.'s
impairments in combination. The ALJ found that prior to September 1, 2009, L.D. had a
less than marked limitation in the domain of caring for yourself because she could "drink
from a cup, was cooperative with self care, and could dress herself simply, as well as exert
her independence." (R. 286). For the period September 1, 2009 to the date of the
decision, the ALJ still found a less than marked limitation, explaining that L.D. "takes baths,
brushes her teeth, keeps her room clean and helps with dishes with reminders, despite her
asthma." (R. 287).

Plaintiff claims that this analysis is flawed because the ALJ did not consider L.D.'s
sleep apnea or ODD as it relates to the caring for yourself domain. (Doc. 26, at 16).

39

Plaintiff first notes that under the regulations, "disturbance in . . . sleeping patterns" is an example of limited functioning in caring for yourself. 20 C.F.R. § 416.926a(k)(3)(vi). She claims that L.D. "often removed her CPAP mask during the night," and objects that the ALJ should have discussed this fact in connection with the caring for yourself domain. (Doc. 26, at 16). The Court disagrees.

It is not true that L.D. "often" removed her CPAP mask during the night. Her mother testified that she wore it 90% of the time (R. 508), which is consistent with medical records from Dr. D'Andrea indicating that L.D. was wearing the CPAP every night through most of the night in both April 2008 and September 2009. (R. 472, 474). The regulations make clear that the examples of limited functioning "do not necessarily describe a 'marked' or 'extreme' limitation," 20 C.F.R. § 416.926a(k)(3), and the Court is not persuaded that the ALJ erred in finding that L.D.'s minimal sleep disturbance did not markedly affect her ability to care for herself.

Plaintiff next argues that the ALJ improperly ignored the effect L.D.'s ODD had on her ability to care for herself, noting that L.D. "exhibited aggressive and violent behavior throughout her first grade year and had difficulty controlling her anger." (Doc. 26, at 16). There is no dispute that the ALJ fully considered L.D.'s ODD under the domain of interacting and relating with others which, as noted, is "related, but different from" the domain of caring for yourself. SSR 09-7p, at *4. L.D.'s violence and aggression towards peers and adults constitutes behavior in relation to other people and properly falls under the domain of interacting and relating with others.

Plaintiff claims that SSR 09-7p demonstrates that L.D.'s ODD falls into both categories. She directs the Court to the following example: a boy with ODD who refuses

40

to obey a parent's instruction not to run on a slippery surface demonstrates limitations in both caring for yourself and interacting and relating with others because he endangers himself and disrespects the parent's authority. SSR 09-7p, at *4. Plaintiff's reliance on this example is misplaced in that the boy risked harming himself by disobeying his parent. There is no evidence that L.D.'s refusal to listen to teachers and follow rules placed her in harm's way.

The only exceptions are found in L.D.'s March 2010 IEP. Occupational therapist Ruth Blameuser indicated that L.D.'s sensory processing dysfunction caused her to engage in "banging, leaning or slamming her body into things like wal[l]s, furniture, or lockers." (R. 392). Another section of the report indicated that L.D. "harms . . . self." (R. 372). The ALJ specifically discussed the March 2010 IEP, but did not mention L.D.'s self-injurious behavior. Defendant argues that this omission is harmless because there was no further mention of self-injurious behavior after that date. (Doc. 37, at 17). Indeed, Plaintiff said nothing about L.D. harming herself, the ME observed that there were no ER reports of cuts, bruises, falls or other injuries (R. 539), and that summer she attended eight weeks of camp with little difficulty.

On the record presented, the Court is not persuaded that the ALJ committed reversible error by failing to mention L.D.'s self-injurious behavior. On remand, however, the ALJ should take the opportunity to clarify her conclusions in this regard when analyzing the caring for yourself domain.

### 3. Law of the Case Doctrine

In her initial December 26, 2006 decision, the ALJ found that L.D. had a marked limitation in the domain of health and physical well-being based on her history of asthma. (R. 24). In the subsequent October 5, 2010 decision, the ALJ found that L.D. at all times had a less than marked limitation in the domain of health and physical well-being. (R. 286, 287). Plaintiff objects that this changed finding violates the law of the case doctrine and is unsupported by the evidence.

The law of the case doctrine requires "the administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart." *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998) (citing *Law v. Medco Research, Inc.*, 113 F.3d 781, 783 (7th Cir. 1997)). Plaintiff argues that the ALJ erred because after she considered L.D.'s obesity and sleep apnea together with her asthma, she "somehow . . . found a lesser limitation than when she had evaluated L.D.'s asthma on its own." (Doc. 26, at 18). Plaintiff objects that the ALJ did not explain why her opinion changed, and claims there was no new evidence to contradict the earlier finding. (*Id.*).

Unlike the other five domains, the domain of health and physical well-being does not categorize children by age group. Rather, "we consider the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on your functioning." 20 C.F.R. § 416.926a(l). Following the remand, Plaintiff submitted new evidence regarding L.D.'s condition after December 2006. This evidence showed that L.D.'s sleep apnea was under control with a CPAP by April 2008 (R. 472), and that she was still doing well with the mask more than a year later in September 2009. (R. 474).

Moreover, despite her obesity and apnea, L.D. was doing "fairly well" with her asthma in May 2007 (R. 459); her asthma was under "partial control" with no ER visits or nighttime awakenings in February 2008 (R. 458); her asthma symptoms were "quite well controlled" and she had not used any inhalers for a month in August 2008 (R. 457); and she was "doing fine" with stable asthma in August 2009. (R. 453). Notably, Plaintiff did not submit any additional asthma or sleep apnea records for L.D. after August 2009. Plaintiff did provide new testimony at the September 2010 hearing, however, confirming that L.D.'s asthma was under control with Singulair and Albuterol (R. 495-96), and that L.D. attended day camp in the summer of 2010 and really liked the skating, swimming, bowling and outdoor playing. (R. 506-07).

"The doctrine of law of the case is not a straitjacket," and "is at its least rigid when a judge is reconsidering h[er] own previous ruling." *Cadenhead v. Astrue*, No. 05 C 3929, 2010 WL 5846326, at *12 (N.D. Ill. Mar. 5, 2010) (citing *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995)). In stipulating to a remand, the parties did not make any reference to L.D.'s asthma, and the ALJ fairly revisited that condition in the context of all available evidence through August 31, 2009, including L.D.'s sleep apnea and obesity. *See Wilder*, 153 F.3d at 803 ("New evidence can furnish compelling grounds for departure from a previous ruling.") The Court finds no error in the ALJ's decision that L.D. had a less than marked impairment in health and physical well-being, and the request for remand pursuant to the law of the case doctrine is denied.

### 4. Credibility Finding

Plaintiff finally argues that L.D.'s case must be remanded because the ALJ failed to determine whether or not Plaintiff's testimony was credible. In support of this position,

43

Plaintiff directs the Court to *Giles ex rel. Giles v. Astrue*, in which the Seventh Circuit remanded a child SSI case where "the ALJ did not make a credibility assessment as to [the plaintiff's] testimony, though the ALJ did recite some parts of the testimony." 483 F.3d at 488-89. The court explained that:

> If [the plaintiff's] testimony was not credible, the ALJ was obligated to explain the basis of that assessment. If, on the other hand, [the plaintiff's] testimony was credible, the ALJ was required to explain why the testimony did not support a finding that [her minor son] was markedly limited in attending and completing tasks.

*Id.* at 489.

Plaintiff acknowledges that the ALJ did recite some of her testimony about L.D. joining Girl Scouts, having friends, doing well with the CPAP, and not having behavior issues after being placed in the smaller school setting. (R. 287). Plaintiff claims, however, that the ALJ neglected to address other testimony that supported a finding of disability. By way of example, Plaintiff notes her testimony that L.D.: takes her CPAP mask off in the middle of the night; got into trouble on the bus one time after transferring to the smaller school setting; did not ask for any play dates; "had problems with hitting her" sister; and got a write-up at summer camp. (Doc. 26, at 19).

The Court disagrees that the ALJ failed to mention any of these additional facts. With respect to the CPAP, the ALJ noted that in April 2008, Plaintiff told Dr. D'Andrea that L.D. was "doing quite well with the CPAP." (R. 278). The same report stated that L.D. was able to use the machine every night and wore it "throughout the entire night." (R. 472). The ALJ also observed that in September 2009, Plaintiff once again told Dr. D'Andrea that L.D. "does well" with the CPAP. (R. 278, 474). Plaintiff did testify that L.D. sometimes

44

takes the CPAP mask off during the night, but she also conceded that L.D. wore it about 90% of the time.  (R. 508).

Plaintiff is correct that the ALJ did not mention her testimony that L.D. got in trouble on the bus and did not ask for any play dates after moving to the smaller school setting. Yet Plaintiff herself acknowledged that the bus problems stopped after the driver started making L.D. sit in the front, and that L.D. had a lot of friends at her old school and just did not know that many kids at the new school yet.  (R. 493, 498-99).  The ALJ observed that L.D. received a write-up at summer camp and talked back to her teacher twice after moving to the new school.  The ALJ also stated that L.D. argues with her sibling but mostly gets along, which is consistent with Plaintiff's testimony that they "get along pretty much.  But they do argue."  (R. 287, 505).

The Court is not persuaded that the ALJ rejected any of Plaintiff's testimony, or that it would have supported a finding of disability.  In *Buckhanon ex rel. J.H. v. Astrue*, 368 Fed. Appx. 674 (7th Cir. 2010), the Seventh Circuit addressed whether an ALJ is required to make an explicit credibility finding if she believes the plaintiff's testimony.  The court noted that under *Giles*, credibility findings "should be express and reasoned" so that ALJs "proceed cautiously before rejecting specific portions of a claimant's testimony as not credible."  *Id.* at 678 (citing *Giles ex rel. Giles*, 483 F.3d at 488).  The court then distinguished the facts of *Buckhanon*, where it was "plain" that "the ALJ *believed* the testimony of both [the minor child] and [her grandmother]."  *Id.* (emphasis in original).  As the court explained, "we do not see how the claimants could have been prejudiced by the ALJ's decision not to give a detailed explanation for her obvious *reliance* on their testimony."  *Id.* (emphasis in original).

45

As in *Buckhanon*, this Court finds that the ALJ clearly believed Plaintiff's testimony and relied on it in making her decision in the case. The ALJ did not ignore any testimony that would have supported a finding of disability or otherwise reject any of Plaintiff's statements. On these facts, the Court declines to remand the case because the ALJ failed to make an explicit credibility finding.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 25] is granted, and the Commissioner's Motion for Summary Judgment [Doc. 36] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: January 24, 2012

SHEILA FINNEGAN
United States Magistrate Judge